## AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT

I, Mark B. Dargis, being duly sworn and appointed as a Special Agent of the Federal Bureau of Investigation, hereby make the following statement, based on information obtained by myself, other Special Agents of the Federal Bureau of Investigation, the U.S. Department of Health and Human Services Office of Inspector General, the U.S. Office of Personnel Management Office of Inspector General, and Detectives of the District of Columbia Metropolitan Police Department.

1. This Affidavit is made in support of an arrest warrant for **MELVIN GALE**, residing at

_____

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since 2003, assigned to the Washington Field Office in the District of Columbia. In that time I have been assigned to a white collar crime unit, investigating health care fraud matters in the District of Columbia and surrounding areas, to include the diversion of prescription narcotic drugs and the commission of related drug crimes by those who illegally obtain and sell prescription narcotic drugs. Since 2003, I have received training and experience in the enforcement of the laws of the United States, interviewing and interrogation techniques, arrest procedures, search warrant applications, search and seizure, white collar crimes, health care fraud, prescription drug diversion and associated fraud in the field of pain management, and various other crimes. In July, 2005, I attended specialized training conducted

1

by the National Health Care Anti-Fraud Association focusing on the areas of prescription drug diversion and pain management fraud. In the overall course of my training and experience, I have become familiar with the methods and techniques associated with the diversion of prescription narcotic drugs, the distribution of illicit narcotics and other controlled substances, the laundering of drug sale proceeds, and the organization of criminal drug conspiracies. In the course of conducting my investigations of health care fraud, prescription drug diversion, and pain management fraud since 2003, I have either been involved in the use of, or coordinated the planning and execution of, the following investigative techniques: research of public records and databases, physical surveillance, electronic surveillance including consensual monitoring and recording of conversations, data analysis, the use of confidential informants and cooperative witnesses, undercover operations, and search warrant operations.

3. The facts and information contained in this Affidavit are based upon my personal knowledge of this investigation, and also the information conveyed to me by other Special Agents of the FBI, the Department of Health and Human Services Office of Inspector General (HHS-OIG), the Office of Personnel Management Office of Inspector General (OPM-OIG), and Detectives of the District of Columbia Metropolitan Police Department (MPD) who are involved in this investigation. The information in this Affidavit does not include each and every fact known to the Government, rather it only includes the information necessary to prove that probable cause exists for an arrest warrant to be issued for MELVIN GALE, for violation of Title 21, United States Code, Section 841(a) (Distribution of a Controlled Substance).

## CONDUCT OF INVESTIGATION

4. On or about April 20, 2006, a Cooperative Witness (hereinafter CW #1) who is currently

2

being prosecuted in another jurisdiction voluntarily contacted the FBI and reported that an individual known to him/her as MELVIN GALE (hereinafter "GALE") is a significant trafficker of diverted prescription drugs in Washington, D.C. CW #1 was subsequently interviewed by Special Agents of the FBI regarding the information he/she claimed to possess, and the Agents in turn provided a summarized verbal report to your Affiant.

5. On or about April 25, 2006, Special Agents of the FBI drove in a vehicle with CW #1 to an area of Washington, D.C., where CW #1 claimed to have knowledge of GALE's current residence. CW #1 subsequently identified the residence at _____ Washington, D.C. as that of GALE.

6. On April 26, 2006, a Special Agent of the FBI conducted research of publically available databases via computer and the Internet, using the identification details provided by CW #1, and confirmed that the residence located at _____, D.C. is the most current residence of record for MELVIN GALE. This research also produced GALE'S date of birth and social security account number. The above described results were printed in hardcopy form and reviewed by your Affiant.

7. The same Internet search results described in Paragraph 6 also identify a current motor vehicle registered to GALE as a 2003 Lincoln Town Car Executive - Sedan 4 Door, with VIN 1LHNM81WX3Y703843, and District of Columbia license plate _____.

8. On May 4, 2006, CW #1 was interviewed by your Affiant and related detailed information regarding GALE'S sources for obtaining the diverted prescription drugs and his methods for selling them.

9. On or about May 6, 2006, your Affiant conferred with Special Agent Christopher Gleason

of OPM-OIG, who reported that an individual named MELVIN GALE is currently a registered beneficiary of the Federal Employee Health Benefit Plan (FEHBP), a health insurance program administered by the U.S. Government for federal employees, including those employees of the Government of the District of Columbia. Special Agent Gleason further reported that GALE'S wife, THERESA ALSTON GALE, is also a FEHBP beneficiary, registered as a dependent of GALE. Special Agent Gleason confirmed that the date of birth, social security account number, and home address for GALE in the FEHBP records system were identical to the information obtained previously by Special Agents of the FBI via Internet research.

10. FEHBP health insurance claim data shows that GALE regularly receives monthly prescription refills in his name for a variety of controlled substances. The most commonly received are: Oxycontin (Oxycodone) 40 milligrams, quantity 180 pills, Oxycontin (Oxycodone) 80 milligrams, quantity 30 pills, Percocet (Oxycodone with Acetaminophen) 7.5/325 milligrams, quantity 120 pills, and Methadone 10 milligrams, quantity 120 pills. GALE has been receiving prescription refills through the FEHBP every month since June, 2003.

11. FEHBP health insurance claim data shows that THERESA ALSTON GALE regularly receives monthly prescription refills in her name for a variety of controlled substances. The most commonly received are: Oxycontin (Oxycodone) 40 milligrams, quantity180 pills, Percocet (Oxycodone with Acetaminophen) 7.5/325 milligrams, quantity 120 pills, and Methadone 10 milligrams, quantity 120 pills. THERESA ALSTON GALE has been receiving presccription refills through the FEHBP every month since April, 2003.

12. According to the Controlled Substances Act of 1970 (21 U.S.C. § 801 et seq.), further enhanced by the Schedules of Controlled Substances found at 21 C.F.R. § 1308 et seq.,

4

Oxycodone, Oxycodone with Acetaminophen, and Methadone are all Schedule II controlled substances.

13. On June 18, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 19, 2006, with the intention of purchasing diverted prescription drugs from GALE. This call was monitored and recorded by Special Agents of the FBI.

14. On June 19, 2006, CW #1 arrived at the location of a pre-arranged meeting with GALE in northeast Washington, D.C., and was subsequently directed via cellular telephone by GALE to follow GALE'S vehicle. GALE eventually led CW #1 to the vicinity of and                      , Washington, D.C., and parked directly adjacent to                                        Street Northeast. CW #1 exited his/her vehicle and entered the passenger side of GALE'S vehicle, whereupon CW #1 exchanged $2300 in FBI-provided funds for 100 pills of Oxycontin 40 milligrams and 120 pills of Percocet 7.5/325 milligrams provided by GALE. The entire meeting was recorded for both audio and video by Special Agents of the FBI using technical equipment worn by CW #1.

15. Additionally, during the conduct of the June 19, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. The vehicle in which CW #1 and GALE were observed together was a gold-colored Lincoln four-door sedan.

16. At the conclusion of the meeting with GALE on June 19, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycontin and Percocet pills, contained in two separate unlabeled plastic bottles, as evidence. CW #1 was subsequently debriefed and reported that

GALE instructed him/her to rip the pharmacy labels off of one of the bottles before departing. GALE ripped the pharmacy label off of the other bottle. CW #1 further reported that he/she observed the last name GALE on the label that he/she removed.

17. On June 26, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 27, 2006 with the intention of purchasing diverted prescription drugs from GALE. This call was monitored and recorded by Special Agents of the FBI.

18. On June 27, 2006, CW #1 attended a pre-arranged meeting with GALE at GALE'S residence located at                              t, Washington, D.C. During the course of the meeting, CW #1 exchanged $3000 in FBI-provided funds for 90 pills of Oxycontin 40 milligrams and 30 pills of generic Oxycodone 80 milligrams provided by GALE. The entire meeting was recorded for both audio and video by Special Agents of the FBI using technical equipment worn by CW #1.

19. Additionally, during the conduct of the June 27, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. During the surveillance operation, a gold-colored Lincoln four-door sedan with D.C. license plate              as observed parked on the street, curbside in front of GALE'S residence.

20. At the conclusion of the meeting with GALE on June 27, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycodone and Oxycontin pills, contained in two separate unlabeled plastic bottles, as evidence. CW #1 was subsequently debriefed and reported that GALE instructed him/her to rip the pharmacy labels off of the bottles before leaving the residence. CW #1 further reported that he/she observed the patient name MELVIN GALE on

6

one label and THERESA ALSTON on the other label.

21. On June 28, 2006, at the direction of the FBI, CW #1 contacted GALE telephonically and arranged to meet him on June 29, 2006 with the intention of again purchasing diverted prescription drugs from GALE. This call was monitored and recorded by Special Agents of the FBI.

22. On June 29, 2006, CW #1 attended a pre-arranged meeting with GALE at GALE'S residence located at _____ Washington, D.C. During the course of the meeting, CW #1 exchanged $4000 in FBI-provided funds for 200 pills of generic Oxycodone 40 milligrams provided by GALE. Although CW #1 was wearing technical equipment provided by the FBI for the purpose of recording the meeting with GALE, it was discovered afterwards that the equipment malfunctioned and no recording was obtained.

23. However, during the conduct of the June 19, 2006, controlled drug purchase operation, physical surveillance of CW #1 was maintained by Special Agents of the FBI, HHS-OIG, and OPM-OIG, who monitored the meeting in real-time via a radio transmitter worn by CW #1. During the surveillance operation, GALE was observed entering a gold-colored Lincoln four-door sedan with D.C. license plate _____ which was parked on the street, curbside across from GALE'S residence. The vehicle, driven by GALE, subsequently departed the area.

24. At the conclusion of the meeting with GALE on June 29, 2006, CW #1 met with Special Agents of the FBI, who seized the Oxycodone pills, which were contained in an unlabeled plastic bottle, as evidence. CW #1 was subsequently debriefed and reported that GALE instructed him/her to rip the pharmacy label off of the bottle before leaving the residence. CW #1 further reported that he/she observed the patient name MELVIN GALE on the label.

25. A review of driver's license data made available by the District of Columbia to law enforcement officers engaged in the conduct of a legitimate criminal investigation shows that the residential property located at _____ Washington, D.C. is listed as the legal address of MELVIN GALE.

## CONCLUSION

26. For the reasons stated herein, your Affiant has probable cause to believe that MELVIN GALE has committed offenses in violation of Title 21, United States Code, Section 841(a) (Distribution of a Controlled Substance). Your Affiant respectfully requests a United States District Court for the District of Columbia issue an arrest warrant for MELVIN GALE.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Mark Dargis, Special Agent
Federal Bureau of Investigation

JUL 11 2006

Sworn to and subscribed before me on this _____ day of July, 2006.

_____
United States Magistrate Judge
District of Columbia

DEBORAH A. ROBINSON
U.S. MAGISTRATE JUDGE